UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

---

PHILLIP RENZULLO, P.R., by and through
Phillip Renzullo as parent and next friend, and
B.R., by and through Phillip Renzullo as parent
and next friend,

      Plaintiffs

           v.

TOWN OF WAKEFIELD; and JOHN RYAN,
Town of Wakefield Police Officer;
CHRISTOPHER GRACE, Town of Wakefield
Police Officer; DAVID MORALES, Town of
Wakefield Police Officer; JOSEPH
ANDERSON, Town of Wakefield Police Officer;
John Doe, I Town of Wakefield Police
Department, John Doe II, Town of Wakefield
Police Department; all in their individual
capacities

      Defendants

---

## COMPLAINT AND REQUEST FOR JURY TRIAL

### INTRODUCTION

This action includes counts for damages, attorneys' fees and costs pursuant to 42 U.S.C. §§

1983 and 1988 for violations and deprivations by the Defendants of the Plaintiffs' rights and

protections guaranteed to them by the First, Fourth, and Fourteenth Amendments to the United

States Constitution, the Massachusetts Declaration of Rights including but not limited to Art. XIV,

Mass. Gen. Law c. 276 §1 *et seq*, and Mass. Gen. Law c. 12, §§11 H and I, as well as damages

pursuant to common law claims set forth herein. Plaintiffs also seek punitive damages.

Claims herein are asserted against certain Town of Wakefield police officers for wrongful

conduct under color of law that includes, but is not limited to a warrantless stop, detention, and/or

arrest and warrantless entry into Plaintiffs' home in the absence of probable cause or other exception to the warrant rule; the use of threats, intimidation, or coercion to attempt to interfere with the Plaintiffs' exercise or enjoyment of rights secured by the laws or Constitution of the Commonwealth or the United States; conspiracy to violate the Plaintiffs' rights; the use of force that was unreasonable under the circumstances; assault and battery; false imprisonment; and the intentional infliction of emotional distress.   Defendant Town of Wakefield ("Wakefield") is sued for tolerating, fostering,  and/or allowing the use of excessive force and/or allowing the development and/or implementation of a policy or custom of violating the state and federal civil rights of civilians, of failing to properly supervise, investigate, educate and/or discipline its police officers including but not limited to a reckless, grossly negligent, callously indifferent approach to officer training, discipline, and oversight, and other wrongful conduct.  Plaintiffs assert that these policies and customs allowed Wakefield police officers to believe they could violate the constitutional rights of civilians, such as the Plaintiffs, with impunity.

## JURISDICTION

1.       Counts I, II, and III of this Complaint set forth civil actions brought to redress deprivations, under color of state law, of rights secured by the First, Fourth and Fourteenth Amendments to the Constitution of the United States and by an Act of Congress pursuant to 42 U.S.C. §§ 1983 and 1988.  Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

2.       Counts IV through IX of this Complaint aver causes of action which are related to the causes of action set forth in Counts I through III and arise out of the subject matter of those Counts.  This Court has jurisdiction over these Counts by virtue of the doctrine of pendent jurisdiction and 28 U.S.C. §1367(a).

## PARTIES

3.      Plaintiff Phillip Renzullo ("Mr. Renzullo"), is of legal age and sound mind, and he is a citizen of the United States.  He resides in Wakefield, Massachusetts.

4.      Plaintiff PR, ("PR"), is a minor child, a citizen of the United States, and a resident of Wakefield, MA.  Mr. Renzullo brings the within claims on behalf of PR as parent and next friend.

5.      Plaintiff BR, ("BR"), is a minor child, a citizen of the United States, and a resident of Wakefield, MA.  Mr. Renzullo brings the within claims on behalf of BR as parent and next friend.

6.      PR and BR are collectively referred to as "Minor Plaintiffs", and Mr. Renzullo, PR, and BR are collectively referred to as "The Plaintiffs" or "All Plaintiffs".

7.      Wakefield is a municipality in Massachusetts and is sued as a local governmental agency under the *Monell* doctrine.

8.      Defendants John Ryan ("Ryan"), David Morales, ("Morales"), Christopher Grace, ("Grace"), Joseph Anderson, ("Anderson" or "Sgt. Anderson"), were at all times relevant to this complaint duly appointed law enforcement members of the Wakefield Police Department, ("WPD").  Their actions alleged in this complaint were taken by each of these Defendants under color of law and pursuant to either official policy, custom, practice, and/or usage of Wakefield. They are each sued in their individual capacity.

9.      Defendant John Doe I, ("Doe I"), a pseudonym, was at all times relevant to this complaint a duly appointed law enforcement member of the WPD and acted as set forth in this complaint under color of law and pursuant to either official policy, custom, practice, and/or usage of Wakefield, all as described herein. Doe I is described as a large male motorcycle officer with black hair and wearing tall black motorcycle boots.  Plaintiffs include Doe I where Plaintiffs are uncertain of the identity of the police officer described herein who acted as set forth herein.  Doe I is sued in his individual capacity.

10.     Defendant John Doe II, ("Doe II"), a pseudonym, was at all times relevant to this complaint a duly appointed law enforcement member of the WPD and acted as set forth in this complaint under color of law and pursuant to either official policy, custom, practice, and/or usage of Wakefield, all as described herein.  Plaintiffs include Doe II where Plaintiffs are uncertain of the identity of the police officers who acted as set forth herein.  Doe II is sued in his individual capacity.

11.     For purposes of the within Complaint, the term "Defendant Officers" as used herein shall refer to the individual Defendants collectively, including Does I and II.

## FACTS

12.     Pursuant to a request from the Melrose Police Department, on or about June 11, 2018 between approximately 10:22 pm and 10:26 pm, WPD officers Conway, David Rando, and John Whaley, and Defendants Anderson and Ryan, arrived at Mr. Renzullo's residence to serve a 209A Restraining Order upon Mr. Renzullo that also included a notice that Mr. Renzullo's License to Carry had been suspended.  The officers stayed at Mr. Renzullo's residence until approximately 10:47 pm, when they determined that no one was home and cleared the area.  On June 11, 2018, there were no outstanding criminal charges or warrants relative to Mr. Renzullo.

13.     On June 12, 2018, at approximately 4:24 pm, Sgt. Anderson was an Officer in Charge at WPD.  At that time, Grace and Ryan were sent to Mr. Renzullo's residence at 30 Eunice Circle, Wakefield, MA, to "serve a 209A Restraining Order and a LTC [License to Carry] suspension order", according to Anderson's Supplemental Narrative.  When Grace and Ryan were sent to Mr. Renzullo's residence, there were no outstanding criminal charges or warrants relative to Mr. Renzullo.

14.     At approximately the same time, Mr. Renzullo was in his home preparing to take his children to soccer tryouts.  He and his children, PR and BR, heard voices in or around his property, calling Mr. Renzullo's name.  When Mr. Renzullo looked to see who was calling him, he initially saw

no one there.  As he checked further, he noticed individuals in regular clothes in and around the

vicinity of his property.

15.     As Mr. Renzullo continued to look around his property, he noticed that the gate to

his fence in his yard was lying on the ground as if it had been kicked down, and that there were

police cars and motorcycles parked on the street with non-uniformed individuals nearby.

16.     Mr. Renzullo called his attorney, Marc E. Chapdelaine ("Atty. Chapdelaine"), to see

if Atty. Chapdelaine could find out why there appeared to be police activity around his home.

17.     At approximately 4:45 pm on June 12, 2018, Atty. Chapdelaine called the WPD on

the recorded line to inquire about what appeared to be police activity around Mr. Renzullo's

property. Atty. Chapdelaine spoke with WPD Officer Matthew Surette and explained that he was

calling on behalf of Mr. Renzullo.  Officer Surette then placed Atty. Chapdelaine on hold.

18.     At or around the same time that Atty. Chapdelaine was on the phone with WPD,

Mr. Renzullo noticed that the cars, motorcycles, and plain-clothed individuals were no longer there.

He then proceeded to put his children in his car and take them to their 5:00 soccer tryouts.

19.     At approximately 4:46 pm, Anderson picked up the phone on the recorded line and

spoke with Atty.  Chapdelaine. Atty. Chapdelaine again explained the reason for his call to Anderson

and stated that he (Atty. Chapdelaine) was wondering if there was some sort of "appearance ticket

or something."

20.     Anderson advised Atty. Chapdelaine that WPD officers were at Mr. Renzullo's home

because they "had some paperwork to serve him from the court", that he believed that Mr. Renzullo

was at home but wouldn't open the door.  Anderson stated that Atty. Chapdelaine could assure Mr.

Renzullo that "he was not going to be arrested" and that the officers were only there to serve the

Restraining Order and other court paperwork.  Anderson then asked Atty. Chapdelaine if Mr.

Renzullo was "there now" and Atty. Chapdelaine responded that he was "unsure."

21.     Anderson then asked Atty. Chapdelaine to call Mr. Renzullo and "have him meet us outside" and that he, (Anderson), would send the officers "back" to the house to serve Mr. Renzullo. Anderson stated that the reason for the police presence was that Mr. Renzullo had firearms registered to him. Atty. Chapdelaine said he would call Mr. Renzullo and then call Anderson right back.

22.     At approximately 4:53 pm, Atty. Chapdelaine called Anderson back on the recorded line and told Anderson that Mr. Renzullo was taking his kids to soccer tryouts for 5:00 pm and then would head over to the police station to pick up the paperwork.  Anderson refused, stating "No, we are going to need to see him at his house to seize his firearms…that's not gonna work…", and then asked Atty. Chapdelaine to call Mr. Renzullo back.

23.     Atty. Chapdelaine then asked if the papers could be served later that evening so Mr. Renzullo could just drop his kids off at soccer first, but Anderson again refused, stating that might have been possible if Mr. Renzullo had answered the door when the officers were first there and didn't "dodge service". Atty. Chapdelaine asked again if Mr. Renzullo could just drop his kids off and meet the officers back at the house to be served, but Anderson refused again stating that he couldn't wait to serve Mr. Renzullo as he had firearms, again stated that if he had answered the door when they were attempting service he could do all that, and added, "but now we are almost at 5:00 so I would like you to call [Mr. Renzullo] back so he doesn't get arrested for violating the order."

24.     Atty. Chapdelaine asked again if Mr. Renzullo could meet the officers back at his house around 5:30-5:45 to be served, and again stated that his kids had soccer tryouts.  Anderson again refused, stating that if Mr. Renzullo had just answered his door and not tried to "dodge service" he could have done that, but now Mr. Renzullo could not drop his children at soccer and had to make other arrangements for his children.

25.     When Atty. Chapdelaine reiterated that it was almost 5:00, and once more asked if Mr. Renzullo could just drop his children off first and be back for service at his house for 5:30, Anderson again refused stating that he "personally" did not feel comfortable with that, and told Atty. Chapdelaine that he wanted to Mr. Renzullo to be served with the order now. He then added that after Mr. Renzullo was served, they would "consider letting him take his child to soccer" and then return to his house for the seizure of any firearms. Anderson then told Atty. Chapdelaine to have Mr. Renzullo come on out as he had an officer nearby, they would then serve his with the Restraining Order, and then Mr. Renzullo could drop his daughter off and come back to the house for the "inventory" of the firearms.

26.     When Anderson told Atty. Chapdelaine that Mr. Renzullo could not first drop his children off at soccer and that had to return to his home immediately to be served with the Restraining Order, that he could not go to the station to accept service or be served later that evening at home, and that Mr. Renzullo had to return immediately to his house "so that he doesn't get arrested for violating the order", Anderson knew or should have known that there was no legal basis or authority for him to refuse to allow M. Renzullo to drop his children off at soccer, to require Mr. Renzullo to return home immediately, or to refuse to allow Mr. Renzullo to accept service voluntarily.

27.     When Anderson told Atty. Chapdelaine that Mr. Renzullo had to return to his home immediately so that WPD police officers could seize and inventory his firearms, Anderson knew or should have known there was no order or warrant permitting WPD officers to enter Mr. Renzullo's home or to "seize" his firearms.

28.     When Anderson refused to allow Mr. Renzullo to pick up the Restraining Order at the police station or to meet the officers back at his home for service later that evening, Anderson did so with no legal justification or authority, but instead acted arbitrarily and with personal animus

toward Mr. Renzullo because, as he stated repeatedly to Atty. Chapdelaine, Anderson believed that Mr. Renzullo had attempted to dodge service earlier that evening.

29.     When Anderson instructed Atty. Chapdelaine to tell Mr. Renzullo to return home immediately to be served "so that he doesn't get arrested for violating the order", Anderson knew or should have known that Mr. Renzullo could not be arrested for violating the Restraining Order as Anderson knew the order had not yet been served and that Mr. Renzullo had committed no crime.

30.     When Anderson instructed Atty. Chapdelaine to call Mr. Renzullo and instruct him to return immediately to his home be served with the 209A Restraining Order to avoid getting arrested for violating the order, Anderson intended that statement as a threat and/or coercion for the sole purpose of attempting to interfere with Mr. Renzullo's exercise and enjoyment of his rights that include, among other things, the right to be safe and secure in his person, the right to not be deprived liberty without due process of law, the right to be free from unreasonable searches or seizure, and the right to move about freely; all as secured under the laws of the United States of America and/or the Commonwealth

31.     At no time during his conversations with Atty. Chapdelaine did Anderson ask Chapdelaine if Mr. Renzullo had any firearms in the car with him.

32.     Less than a minute after the call between Anderson and Atty. Chapdelaine ended, Ryan, who was in an unmarked WPD vehicle driven by Grace, called in to the station on a recorded traffic line to report that "we are going to follow him he is going to drop his daughter off at practice and then follow him back here."  Ryan reported that he was on Salem Street heading to 128 North. Sgt. Anderson then intervened on the same call and ordered Ryan at approximately 4:57 pm to "stop [Mr. Renzullo] and have him served with the order at least and then we'll have him meet us back there."

33.     Anderson also authorized additional police presence in the area to assist, as evidenced by his statements on the recorded traffic calls.

34.     When Anderson ordered Ryan to stop Mr. Renzullo, it was for the sole purpose of serving a 209A Restraining Order ("Restraining Order".)

35.     When Anderson ordered Ryan to stop Mr. Renzullo for the sole purpose of serving a Restraining Order, Anderson, Ryan, and Grace knew or should have known that such a stop would result in a clear violation of Mr. Renzullo's established civil rights as protected to the Fourth Amendment and Fourteenth Amendments to the US Constitution and the Mass. Const. Decl. Rights Art. XIV, among other things, and in direct contradiction and violation of the tenets specifically established by the Supreme Judicial Court of Massachusetts in *Commonwealth v. Richard Sanborn*, 477 Mass. 393 (2017).

36.     When Anderson ordered Ryan to stop Mr. Renzullo for the sole stated purpose of serving a Restraining Order, Anderson, Ryan and Grace knew or should have known that there was no warrant or other legal justification to stop, search or seize Mr. Renzullo or his property.

37.     When Anderson ordered Ryan to stop Mr. Renzullo for the sole stated purpose of serving a Restraining Order, Anderson did not advise Ryan or any other officer of any suspicion that Mr. Renzullo had firearms in his car, nor did he advise any officers that Mr. Renzullo may pose a danger to the officers or the public.

38.     When Anderson ordered Ryan to stop Mr. Renzullo for the sole stated purpose of serving a Restraining Order, Anderson knew or should have known that no objectively reasonable emergency or other exception to the warrant rule existed to justify the stop, and Anderson did not articulate any such emergency or exception to the warrant rule to Ryan or any other officer.

39.     When Anderson ordered Ryan to stop Mr. Renzullo for the sole purpose of serving a Restraining Order and acknowledged and encouraged other officers in the area to participate in the

stop, he knew or should have known that there was a high likelihood that his and the responding officers' actions would result in a violation of Mr. Renzullo's civil rights.

40.     Grace's June 12, 2018 Narrative ref: 18-7665-AR, ("Grace's Narrative"), confirms that he and Ryan were told to stop Mr. Renzullo for the sole purpose of serving a Restraining Order, and then to return to Mr. Renzullo's home to retrieve firearms.

41.     Grace's Narrative reports that after being ordered to stop Mr. Renzullo, Mr. Renzullo entered the on-ramp to Rte. 128 and continued on to the top of the ramp. Grace and Ryan followed Mr. Renzullo without activating any lights or otherwise indicating to Mr. Renzullo that they were law enforcement or wanted him to stop.

42.     According to Grace's Narrative, and despite having made no attempt to identify his car to Mr. Renzullo as a police car, and despite not having activated any lights or sirens to pull Mr. Renzullo over, Grace reports that he then determined Mr. Renzullo was trying to "elude" them, so he activated the blue lights and siren to pull him over.

43.     According to Grace's Narrative, Grace and Ryan then followed Mr. Renzullo's car for another ¾ of a mile on 128 North before Mr. Renzullo stopped in the breakdown lane.

44.     When Grace and Ryan pulled Mr. Renzullo over, they did so for the sole purpose of serving a Restraining Order, they knew or should have known that they had no legal basis for stopping Mr. Renzullo, and that doing so was a clear violation of Mr. Renzullo's previously established state and federal constitutional rights protecting him from a warrantless stop, search and seizure as specifically proscribed in *Comm. v. Sanborn, id.*

45.     Immediately upon pulling Mr. Renzullo over, Grace approached Mr. Renzullo's car on the driver's side with his firearm upholstered and pointed into the car and at Mr. Renzullo and at PR in the passenger seat, and also pointed his loaded gun in close proximity of PR seated in the rear.

46.     At approximately the same time, Morales also approached the drivers' side pointing a taser/stun gun at Mr. Renzullo and in similarly close proximity to PR and BR

47.     At all times relevant, PR was awake and conscious in the passenger side next to Mr. Renzullo and was in the line of fire of both Grace's and Morales' weapons.  BR was at all times relevant in the back seat of the car, was awake and conscious and also similarly in close proximity.

48.     Pointing a taser/stun-gun at an individual is a use of force and threat of harm. Pointing a loaded gun at an individual is a use of force and threat of deadly harm.

49.     When Grace and Morales approached Mr. Renzullo's car with their weapons drawn, loaded, and pointed at Mr. Renzullo and PR and in close proximity of BR, they knew or should have known that they used force that was unreasonable under the circumstances, and knew or should have known that such a show of force and threat of harm would place the individuals in the car in . fear for their safety or lives.

50.     When Grace pointed his drawn, loaded firearm at Mr. Renzullo and in the proximity of PR and BR, he was shouting at Mr. Renzullo to open his window and put his hands outside the window.  Mr. Renzullo complied immediately by opening his window and putting both hands and arms outside the window.  He then asked what was going on.

51.     While still using one hand to keep his firearm pointed at Mr. Renzullo, and without any legal basis or justification, Grace used his other hand to grab Mr. Renzullo's right arm.

52.     At the same time, yet another WPD officer, John Doe I, approached the passenger side of the car where PR was seated, and was violently banging on the window where PR was seated, and pulling on the door handle, screaming at PR to open the door, thereby placing all Plaintiffs in abject fear for their safety.

53.     Grace continued shouting at Mr. Renzullo in a threatening and aggressive manner while Mr. Renzullo's arms were still outstretched through the window of the car.  Grace continued

to point the loaded gun into the car while grabbing at Mr. Renzullo's arm(s) and then ordered Mr. Renzullo to open his car door.

54.     Mr. Renzullo told the officers that he could not comply with the order to open the drivers' side door of his vehicle without putting one of his hands back inside the car to open the door. Nevertheless, Grace and Morales continued to order him to open the door.  As he then attempted to comply by moving his left arm down to open the door, Grace and Morales grabbed Mr. Renzullo forcefully.  While Mr. Renzullo's right arm was still outstretched through the window, Grace and Morales violently yanked Mr. Renzullo out of the car and threw him to the ground.  This occurred in the presence of the other officers on the scene.

55.     Although John Doe I and John Doe II were on the scene at all times relevant hereto and had an opportunity to intervene to prevent the physical abuse by Grace, Morales, and Ryan, neither John Doe took any action to intervene to stop the use of unreasonable force by Ryan, Grace and/or Morales, and in the alternative, one or both John Does participated in employing unreasonable force and intimidation against the Plaintiffs.

56.     While Mr. Renzullo was on the ground, Grace and Ryan and John Does I and II handcuffed him, then pinned his arms to his side using a large plastic restraint that wrapped around his arms and his chest. Mr. Renzullo was unable to move.

57.     After Mr. Renzullo was rendered immovable, Grace, Ryan, and John Does I and II then piled on top of Mr. Renzullo, shoved his head and face into the ground, and began beating and battering him.

58.     At no time did any of the Defendant Officers intervene to stop the beating of Mr. Renzullo, despite their opportunity to do so, and despite the WPD Police Department Use of Force Policy that requires officers to intervene if they observe a situation in which they perceive more than the necessary use of force being deployed by a fellow officer.

59.     At one point during the beating, Grace jumped on Mr. Renzullo's back using his knees.  One knee hit Mr. Renzullo full force on his back and the other landed full force on the back of Mr. Renzullo's head and neck, causing him to choke.

60.     Grace then grabbed Mr. Renzullo's left arm and said, "this is for not letting us in the house", and then wrenched Mr. Renzullo's arm with such force that Grace broke Mr. Renzullo's left elbow.

61.     While Mr. Renzullo was unable to move and was restrained on the ground, Morales was hitting Mr. Renzullo on his right side.

62.     At all times relevant, Mr. Renzullo did not resist the officers, he did not disobey the officers, and he did not attempt to leave the scene at any time prior to or during these police actions. At all times relevant, Mr. Renzullo was compliant and obeyed all commands from the officers without resistance, and to the best of his ability to do so.

63.     After beating and battering Mr. Renzullo in the presence of his young children who were sitting terrified in the car, WPD Officers including Ryan, Morales, Grace, and John Doe I and John Doe II forcefully put Mr. Renzullo in the rear of a cruiser.  The cruiser had no back seat, so when Mr. Renzullo was thrown into the rear of the cruiser while handcuffed and secured with the plastic restraints, he landed heavily on the cruiser floor, impacting his already-injured arm and causing him further pain.

64.     Morales drove the cruiser with Mr. Renzullo in the back to the WPD Station.  Mr. Renzullo was not read his Miranda rights by Grace, Ryan, or Morales, or by any other officer on scene.

65.     At some point after Mr. Renzullo was arrested, and without asking or obtaining consent from Mr. Renzullo, Ryan entered Mr. Renzullo's vehicle and drove it to Mr. Renzullo's residence with PR and BR inside.

66.     The last Mr. Renzullo saw of his children before he was thrown to the ground, beaten and taken away, they were sitting in his parked car on or about the top of the on-ramp to Rte. 128 North.

67.     When Mr. Renzullo arrived at the WPD station, he was booked and processed by Anderson.  When Mr. Renzullo asked Anderson why he was arrested, Anderson told Mr. Renzullo that he had been arrested for not letting officers into his home earlier that afternoon.

68.     While Mr. Renzullo was being booked, he told Anderson that he was in a lot of pain, stating that his head hurt, his arm and shoulder hurt, and that he felt dizzy.  Anderson responded that there was nothing wrong with him.

69.     When Mr. Renzullo repeated that he was in a lot of pain, Anderson told Mr. Renzullo that he would call for emergency medical assistance, but that if Mr. Renzullo told the EMTs that anything was wrong, the EMTs would have to take him to the hospital, then he would be brought back to the station, and he would have to stay in that "teeny weeny" cell all night, overnight, and that he would not be able to go home to his children.

70.     Fearing that his children would be left alone overnight after what Anderson had just told him, Mr. Renzullo told Anderson that he was feeling OK and that perhaps it was just anxiety. However, Anderson had called the EMT's.

71.     When the EMTs arrived, Mr. Renzullo, fearing what Anderson had threatened – that he would be held in a cell and his children left unattended if he claimed to be injured - advised the EMT's that he was ok and that he thought he just had anxiety. The EMT's took his blood pressure and left without checking his injured arm.

72.     While Ryan and other WPD Officers were at Mr. Renzullo's home with the minor Plaintiffs, John Doe I went into the house with them and ordered them to change out of their sports clothes and into regular clothes in his presence.  When the minor Plaintiffs resisted because they did

not feel comfortable changing in front of the male officer, the officer repeated his order that the minor Plaintiffs change their clothes in front of him.  PR and BR were intimidated into complying.

73.     At all times relevant, Mr. Renzullo had a "dash cam" affixed to his vehicle that was on, operational, and recording.  However, when Mr. Renzullo finally retrieved his vehicle after WPD seized it, the dash cam footage had been erased.

74.     Despite their illegal stop, seizure, and detention of Mr. Renzullo, WPD and the Defendant Officers falsely and maliciously and in concert with each other, charged Mr. Renzullo with failure to stop for police, negligent operation of a motor vehicle, and resisting arrest.  After being booked and processed at the WPD station, Mr. Renzullo was released on personal recognizance.

75.     After Mr. Renzullo was released from custody, Anderson told him that Morales had to drive him home, and that if he didn't cooperate, he would be thrown back in the cell.

76.     When Morales brought Mr. Renzullo back to his house, Morales and the Defendant officers told him they wanted to seize his firearms.  When Mr. Renzullo balked at letting them into his house, Grace and WPD Officer Flynn screamed at him to "open the fucking door."  In fear for his safety, of being thrown back in a cell, and of more retaliatory beatings by the officers if he refused to allow entry, Mr. Renzullo agreed to allow one officer into his home.  However, all the officers entered his home.

77.     Morales told Mr. Renzullo that he had better cooperate if he wanted things to "go easy" and Grace ordered him to "sit on the fucking couch" or they would "fuck him up" as they started searching Mr. Renzullo's house for guns.

78.     Although Mr. Renzullo directed the Officers to his firearm safes and provided them with the combinations to the safes so that they could retrieve the firearms, Grace and the Defendant

officers nevertheless proceeded to ransack Mr. Renzullo's home and take and/or damage his property.

79.     When Mr. Renzullo asked if he could to go the bathroom, the officers refused and told him to "sit the fuck down".  Grace threated to "break [Mr. Renzullo's] *other* arm."

80.     The next day, June 13, 2018, Mr. Renzullo went to Hallmark Health Urgent Care in Reading, MA, and was immediately directed to Melrose-Wakefield Hospital due to the increasing pain and inability to use his arm.  At the Melrose-Wakefield Hospital, Mr. Renzullo's left arm was X-Rayed and he was given a CT-scan of his head.  The tests showed that his left elbow had been fractured and that he had suffered a concussion.

81.     The Defendant Officers all participated and acted in concert with each other to falsely charge Mr. Renzullo with committing crimes in an attempt to cover up their misconduct.

82.     Ultimately all criminal charges against Mr. Renzullo were dismissed by the Malden District Court upon request of the Commonwealth on or about June 24, 2019; over one full year after his false arrest, and after more than a year of abusive, negligent, and improper prosecution resulting from the false allegations aggressively pursued by the Defendants.

83.     As a direct and proximate result of the wrongful conduct of the Defendant Officers and WPD, Mr. Renzullo suffered and continues to suffer physical damages including but not limited to facial pain, trauma to his right TMJ joint with pain and clicking, broken left elbow (coronoid process fracture), pain to his head and neck, pain to his right side, emotional trauma, emotional distress, lightheadedness, dizziness, and left side, shoulder, arm and elbow pain.

84.     As a direct and proximate result of the wrongful conduct of all Defendants, all Plaintiffs suffered substantial emotional distress and anxiety and still do not feel safe or secure in or around their own home.  Mr. Renzullo's anxiety around police is such that he no longer trusts police to protect or assist him in the event that a crime is perpetrated against him.  PR and BR are still

fearful of being out of their home and even fearful of being in their own yard.  PR suffered from and continues to suffer from anger issues and difficulty sleeping as a result of the actions engaged in by the Defendants.

85.    As a direct result of the wrongful conduct of the Defendants, Mr. Renzullo's License to Carry a firearm in the Commonwealth of Massachusetts was revoked by WPD and in retaliation for his defense of the baseless charges against him, WPD still refuses to reinstate his license without just cause.

86.    In furtherance of the pursuit of wrongful prosecution and action against Mr. Renzullo by the Defendants, WPD, by and through Officer Shane Pelletier, a duly authorized agent of WPD, filed a "Report of Child(ren) Alleged to be Suffering from Serious Physical or Emotional Injury by Abuse or Neglect" with the Massachusetts Department of Children & Families, falsely accusing Mr. Renzullo of neglect, referring to "arrest report", and falsely alleging that Mr. Renzullo "fled in vehicle with children."

87.    Wakefield has allowed policies or customs to develop within its police department that have caused Wakefield police officers to believe they can violate rights protected by the Constitution with impunity.  These policies or customs were a moving force behind the misconduct that resulted in the violation of the Plaintiffs' constitutional rights.

88.    Prior to June 12, 2018, Wakefield had a policy of deliberate indifference to the right of civilians by failing to adequately supervise, educate, and/or discipline its police officers.

89.    In keeping with this policy or custom, Wakefield ignored the actions of Sgt. Anderson and the Defendant officers, failed to conduct an adequate investigation, failed to educate their officers as to appropriate conduct under the circumstances, and did not discipline any of the officers for the misconduct described herein.

90.     Wakefield failed to appropriately supervise its officers, including the Defendant Officers, to monitor their conduct and behavior to ensure that it did not violate WPD policies or the constitutional rights of civilians.

91.     Sgt. Anderson, knowing that his calls and communications were being recorded, nevertheless illegally and wrongfully said to Atty. Chapdelaine that Mr. Renzullo had no right to appear at the police station or meet officers back at his home after dropping his children at soccer to voluntarily accept service of the Restraining order.

92.     Sgt. Anderson, knowing that his calls and communications were being recorded, nevertheless illegally threatened Mr. Renzullo with arrest by and through Marc Chapdelaine, in order to coerce Mr. Renzullo and interfere with his constitutional rights, including but not limited to his right move about freely.

93.      Sgt. Anderson, knowing that his calls and communications were being recorded, and despite having been advised by Atty. Chapdelaine that Mr. Renzullo would return to be served with the Restraining Order as soon as he dropped his children off at soccer, nevertheless specifically and illegally ordered Ryan and Grace to pull Mr. Renzullo over for the sole purpose of serving him with a Restraining Order.

94.     Anderson's actions evidence his belief that his conduct would not be properly monitored or reviewed, and that Wakefield would tolerate his unconstitutional behavior, even when recorded.

95.     The Defendant Officers similarly carried out knowingly illegal orders to stop and detain Mr. Renzullo, therefore understandably believing that their supervisors and Wakefield would tolerate their behavior, since the illegal actions were taken in response to an illegal order directly from the officer in charge.

96.     The Defendant Officers clearly believed that their actions, including the misuse of weaponry, the use of threats, and the use of unreasonable force under the circumstances, would be tolerated for the same reasons.

97.     The Defendant Officers were all emboldened by their understanding that Wakefield would not reprimand or discipline them for their behavior and that their behavior would not be supervised or otherwise monitored.

98.     In keeping with its policies, Wakefield, upon information and belief, did not investigate the actions of the Defendant Officers, nor did Wakefield discipline any of them.

99.     A fortiori, they did not educate the Defendant Officers as to the illegality of their conduct so that they would not repeat the same behavior.

100.    Notably, this is not the first time that Wakefield Police Officers have come under scrutiny for misuse of weaponry, the use of excessive force, false imprisonment, and assault and battery.  In 2012, Wakefield and certain of its officers, including the current Police Chief Steven Skory and current Lieutenant Scott Reboulet, were sued by Simeon Niles, (*See Simeon Niles v. Town of Wakefield*, 172 F. Supp. 3d 429 (2016)), for similar conduct as described herein by the Plaintiffs, including but not limited to improperly drawing loaded guns without justification, unlawful stop, search, seizure, assault and battery, and false imprisonment.  The matter survived the defendants' motions for summary judgment in 2016 and settled thereafter.

101.     Wakefield had obligations to supervise, monitor, investigate, discipline, and/or educate its officers in the appropriate use of reasonable force, weaponry, and of behavior previously adjudicated to be in violation of civil rights guaranteed by the United States and the Commonwealth.

102.    Wakefield failed to meet those obligation, as evidenced by the actions of the Defendant Officers, and in light of prior incidents involving Wakefield that would put it on notice that their conduct was prohibited under the circumstances.

103.    Wakefield, by its action and inaction described herein, acted in a reckless, grossly negligent, callously and deliberately indifferent, or other wrongful manner pursuant to 42 USC §1983, that encouraged or otherwise allowed or emboldened its officers to act in a manner highly likely to result in a violation of citizens' civil rights and highly likely and foreseeable to result in harm. *See Monell v. City of New York Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

104.    The violations by the Defendant Officers of all Plaintiffs' constitutional rights were caused by the policies, practices, procedures and/or customs of Wakefield, as described herein.

105.    Defendants' actions as set forth herein, along with the Defendant Officers, exhibited such recklessness and gross negligence and such a deliberate indifference as to shock the conscience of all people.

## COUNT I
## CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. §1983
### (All Plaintiffs v. Defendant Officers, Individually)

106.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 105 of the Complaint as if expressly set forth herein.

107.    This Count is brought by All Plaintiffs against Defendant Officers who, by their actions described herein, violated the constitutional rights of All Plaintiffs as protected by the First, Fourth, and Fourteenth Amendments, including but not limited to right to be safe and secure in their person, the right not to be deprived of life, liberty, or property without due process of law, the right to be free from unreasonable searches or seizures, the right to be free from arrest unsupported by probable cause, the right to be free from excessive force by the police, the right to move about freely, as well as other rights guaranteed or secured under the United States Constitution.

108.    All Plaintiffs suffered physical and emotional harm, and Mr. Renzullo suffered financial loss, as a result of the Defendant Officers' actions and inaction as set forth herein.  The

actions of the Defendant Officers as set forth herein were under color of law and without justification or probable cause.

109.     All Defendants were on notice, knew or should have known, that the actions they took would or were highly likely to violate Mr. Renzullo's and BR and PR's constitutional rights, and were likely to cause them harm.

110.     As a direct and proximate result of the aforesaid acts of the Defendant Officers, who were acting under color of law, the Plaintiffs have suffered from, and will continue to suffer from, physical and financial injuries, mental anguish and other damages.

## COUNT II

### COMMON LAW CONSPIRACY TO VIOLATE CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983
### (All Plaintiffs v. Defendant Officers, Individually)

111.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 110 of the Complaint as if expressly set forth herein.

112.     This Count is brought by All Plaintiffs against Grace, Ryan, Morales, Anderson, John Doe I and John Doe II, all individually, for conspiracy to violate All Plaintiffs' constitutional rights and acted jointly and in concert in furtherance of said conspiracy to violate All Plaintiffs' constitutional rights, and in fact did violate their rights protected by the First, Fourth, and Fourteenth Amendments including but not limited to the right to be safe and secure in their person, the right not to be deprived of life, liberty, or property without due process of law, the right to be free from unreasonable searches or seizures, the right to be free from arrest unsupported by probable cause, the right to be free from excessive force by the police, the right to move about freely, as well as other rights guaranteed or secured under the United States Constitution.

113.     Said conduct thereby obstructed the course of justice and caused a deprivation of rights to the Plaintiffs as set forth herein.

114.     As a direct and proximate result of the aforesaid conspiracy of the Defendant

Officers, who were acting under color of law, Plaintiffs have suffered from, and will continue to

suffer from, physical and financial injuries, property damages, mental anguish and other damages.

**COUNT III**
**CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. §1983**
**(All Plaintiffs v. Wakefield)**

115.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 114

of the Complaint as if expressly set forth herein.

116.     This Count is brought by All Plaintiffs against Wakefield, as it allowed the policies,

habits and/or customs described herein to exist within its police station by, including but not limited

to Wakefield's inaction or insufficient action in training, supervising, and educating its officers.

117.     These policies, habits, and/or customs of Wakefield as set forth herein allowed the

Defendant Officers to believe they could commit misconduct against the Plaintiffs with impunity.

118.     The policies, habits, and/or customs of Wakefield were the moving force behind the

actions that resulted in the violations of the Plaintiffs' civil rights.

119.     All Plaintiffs suffered physical and emotional harm and Mr. Renzullo suffered

financial loss as a direct and proximate result of Wakefield's action, inaction, policies, and/or

customs, as set forth herein.  Mr. Renzullo lost time from work, and all Plaintiffs continue to suffer

emotional harm and humiliation resulting from the horror, excessive force, and intimidation inflicted

upon them by the Defendant Officers as a result of Wakefield's action, inaction, policies, habits

and/or customs, which allowed and enabled the Defendant Officers to violate the Plaintiffs' clearly

established constitutional rights. The actions, etc., of Wakefield as set forth herein were highly likely

to result in the violation of a civilian's civil rights by a WPD officer and would cause harm, as set

forth herein, were foreseeable, and were grossly negligent, deliberately indifferent, and reckless

under color of law and without justification or probable cause.

120.     As a direct and proximate result of the aforesaid acts of Wakefield, the Plaintiffs have suffered from, and will continue to suffer from, physical and financial injuries, mental anguish and other damages.

## COUNT IV
## CIVIL RIGHTS VIOLATIONS PURSUANT TO M.G.L. c. 12 §§11H and I
### (All Plaintiffs v. Defendant Officers, Individually)

121.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 120 of the Complaint as if expressly set forth herein.

122.     This Count is brought by All Plaintiffs against Grace, Ryan, Morales, Anderson, John Doe I and John Doe II, all individually, for civil rights violations pursuant to M.G.L. c. 12, S§11H and I as a result of their threats, intimidation and coercion of All Plaintiffs as set forth hereinabove; such actions having been engaged in by the Defendant Officers for the purpose of interfering with All Plaintiffs' exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the Commonwealth.

123.     As a direct and proximate result of the aforesaid acts of the Officers by means of threats, intimidation and coercion as described herein, All Plaintiffs have suffered from, and will continue to suffer from, physical and financial injuries, emotional distress, mental anguish and other damages.

## COUNT V

## COMMON LAW CONSPIRACY TO VIOLATE M.G.L. c. 12 §§11H and I
### (All Plaintiffs v. Defendant Officers, Individually)

124.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 123 of the Complaint as if expressly set forth herein.

125.     This Count is brought by All Plaintiffs against Grace, Ryan, Morales, Anderson, John Doe I and Jon Doe II, all individually, for common law conspiracy to violate M.G.L. c. 12, §§11H and I.

126.     The actions of the above-referenced Officers as set forth herein show that they acted jointly and in concert in furtherance of said conspiracy to violate Mr. Renzullo's and PR's state and federally protected civil rights by engaging in behavior that included  threats, intimidation and coercion as set forth hereinabove; such actions having been engaged in by the Defendant Officers for the purpose of  interfering with Mr. Renzullo's and PR's exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the Commonwealth as set forth hereinabove.

127.     Said conduct thereby obstructed the course of justice and caused a deprivation of rights to the Plaintiffs as set forth herein, all in violation of M.G.L. c. 12 §§ 11H and I.

128.     As a direct and proximate result of the aforesaid conspiracy of the Defendant Officers, by means of threats, intimidation and coercion, Plaintiffs have suffered from, and will continue to suffer from, physical and financial injuries, emotional distress, mental anguish and other damages.

## COUNT VI
## FALSE IMPRISONMENT
### (All Plaintiffs v. Defendant Officers, Individually)

129.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 128 of the Complaint as if expressly set forth herein.

130.     This Count is brought by All Plaintiffs against all Defendants for false imprisonment.

131.     In falsely and wrongfully detaining All Plaintiffs, and in falsely arresting, confining, and imprisoning Mr. Renzullo without warrant or probable cause and with excessive force as set forth above, Defendant Officers, jointly and in concert and individually, intentionally and without justification, confined all Plaintiffs directly or indirectly, and at all times, each Plaintiff was conscious and was harmed by such confinement.

132.     As a direct and proximate result of the wrongful conduct of all Defendants, All

Plaintiffs have suffered from and will continue to suffer from, physical injuries, emotional distress,

mental anguish and other damages.

## COUNT VII
## ASSAULT AND BATTERY
### (All Plaintiffs v. Defendant Officers, Individually)

133.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 132

of the Complaint as if expressly set forth herein.

134.     This Count is brought by All Plaintiffs against Defendants Grace, Ryan, Morales,

John Doe I and John Doe II, all individually, for assault and battery.

135.     In unjustifiably and intentionally threatening to use or in fact using force against All

Plaintiffs, and/or in intentionally behaving in a wonton or grossly negligent manner resulting in

injury to All Plaintiffs, the Defendant Officers each individually and/or in concert with one another,

assaulted and/or battered each Plaintiff in violation of the protections afforded to them under the

laws of the Commonwealth and the United States of America.

136.     As a direct and proximate result of the conduct of each of the individual Defendants,

All Plaintiffs have suffered from, and will continue to suffer from, physical injuries, emotional

distress, mental anguish and other damages.

## COUNT VIII
## MALICIOUS PROSECUTION
### (Mr. Renzullo v. Defendant Officers, Individually)

137.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 136

of the Complaint as if expressly set forth herein.

138.     This Count is brought by Mr. Renzullo against Defendant Officers for malicious

prosecution.

139.     The Defendant Officers, jointly and severally instituted and/or conspired to institute criminal proceedings against Mr. Renzullo by initiating false charges in the Malden District Court in relation to his June 12, 2018 arrest.

140.     The Defendant officers did so with malice and without probable cause motivated in part by their desire to cover up their own violent bad acts and misconduct perpetrated against Mr. Renzullo and PR and BR.

141.     All criminal charges against Mr. Renzullo relating to the events of June 12, 2018 were dismissed at the request of the Commonwealth, despite the repeated unsupportable and illegal objections of the WPF police prosecutor, the Defendant Officers, and WPD.

142.     As a direct and proximate result of the malicious prosecution by Defendant Officers of Mr. Renzullo, he suffered severe emotional distress, endured physical and mental suffering, false imprisonment, false arrest, shame, humiliation, was forced to spend time and money defending against said malicious prosecution by Defendant Officers, and suffered other damages.

## COUNT IX
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### All Plaintiffs v. Defendant Officers

143.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 142 of the Complaint as if expressly set forth herein.

144.     The intentional or grossly reckless actions described above are attributable to each of the Defendant Officers, jointly and severally.  These actions were outrageous and beyond the scope of common decency.

145.     As a direct and proximate result of the intentional and/or grossly reckless actions described above by the Defendant Officers, the Plaintiffs suffered great emotional distress and damages flowing therefrom.

**WHEREFORE**, Plaintiffs request that this Honorable Court:

A. Award compensatory damages to each Plaintiff;

B. Award punitive damages to each Plaintiff;

C. Award the costs of this action, including interest, and reasonable attorneys' fees and costs to each Plaintiff; and

D. Award any other further relief that this Court deems just and equitable.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
The Plaintiffs,
Phillip Renzullo et al,
By their attorneys,

October 30, 2020

*/S/ Marsha V. Kazarosian*
Marsha V. Kazarosian, Esquire
BBO #262670
marsha@kazcolaw.com
Marc A. Moccia, Esquire
BBO #682386
marc@kazcolaw.com
KAZAROSIAN COSTELLO LLP
546 Main Street
Haverhill, MA  01830
Tel. (978) 372-7758