UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILLIP RENZULLO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TOWN OF WAKEFIELD, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **Case No. 20-cv-11961-DJC**<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER**

CASPER, J.                                                        February 28, 2023

**I.      Introduction**

Plaintiffs Phillip Renzullo ("Renzullo"), P.R., a minor child of Renzullo, and B.R., a minor child of Renzullo (collectively, "Plaintiffs") have filed this lawsuit against the Town of Wakefield ("Wakefield") and Wakefield police officers John Ryan ("Ryan"), Christopher Grace ("Grace"), David Morales ("Morales"), Joseph Anderson ("Anderson"), Kenneth Silva ("Silva") (collectively, "Defendants" or "the Officers") and John Doe II ("John Doe II") alleging violations of 42 U.S.C. § 1983 (Counts I, II and III), violations of the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, §§11H and I (Counts IV and V), false imprisonment (Count VI), assault and battery (Count VII), malicious prosecution (Count VIII) and intentional infliction of emotional distress (Count IX) arising from a motor vehicle police stop and subsequent arrest.  D. 80.  Plaintiffs now move for partial summary judgment on Counts I, II, IV and V.  D. 116. Defendants cross move for summary judgment on all counts.  D. 122.  For the reasons stated

below, the Court DENIES Plaintiffs' motion and ALLOWS in part and DENIES in part Defendants' motion.

## II.     Standard of Review

A court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citation omitted).  The movant "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  If the movant meets its burden, the nonmovant "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

The Court views the record "in the light most favorable to the non-moving part[y]" and draws all reasonable inferences in the nonmovant's favor.  Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008).  The nonmovant, however, "may not rely on conclusory allegations, improbable inferences, or unsupported speculation" to defeat a motion for summary judgment, "but must, instead, 'set forth specific facts showing that there is a genuine issue for trial.'"  Id. at 53–54 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The nonmovant must offer "definite, competent evidence to defeat a properly supported motion for summary judgment." Burns v. State Police Ass'n of Mass., 230 F.3d 8, 9 (1st Cir. 2000).

III.     **Factual Background**

The following facts are undisputed unless otherwise noted and are drawn from Plaintiffs'

statements of material facts, D. 118; D. 133, Defendants' statement of material facts, D. 124, the

parties' respective responses to the other's statement of facts, D. 135, 137, and accompanying

documents.

On the evening of June 11, 2018, Renzullo had an altercation with his sister Paula

Renzullo ("Paula").  D. 124 ¶¶ 31–34; D. 135 ¶¶ 31–34.  Because of this interaction, later that

evening Paula sought and obtained a restraining order pursuant to Mass. Gen. L. c. 209A ("the

209A Order") against Renzullo.  D. 118 ¶ 17; D. 137 ¶ 17; D. 124 ¶ 36; D. 135 ¶36.  The 209A

Order noted that Paula stated that Renzullo had an arsenal of firearms stored in a safe at his

residence and possibly other locations.  D. 118 ¶ 22;  D. 137 ¶ 122; D. 124 ¶ 38; D. 135 ¶ 38; D.

120-13.  The 209A Order commanded Renzullo to stay 100 yards away from Paula and refrain

from contacting or abusing Paula or from going to her home or workplace.  D. 120-13.  The

209A Order also required Renzullo to immediately surrender his firearms and any ammunition,

gun licenses, or FID cards to the Wakefield Police Department ("WPD") or to the serving

officer.  Id.

The next afternoon, June 12, 2018, at approximately 4:24 p.m., WPD police officers

Grace and Ryan were dispatched to Renzullo's Wakefield home to serve the 209A Order.  D.

118 ¶ 17; D. 137 ¶ 17; D. 124 ¶ 54; D. 135 ¶ 54.  When Grace and Ryan arrived at Renzullo's

home, they saw B.R. and asked her if her father was home; she responded that he was and went

inside the home.  D. 118 ¶ 26; D. 137 ¶ 26; D. 124 ¶¶ 56–58; D. 135 ¶¶ 56-58.  Grace and Ryan

waited approximately five minutes, then knocked on Renzullo's door a couple of times,

announcing themselves as police officers there to serve a restraining order, but no one answered. D. 118 ¶ 26; D. 137 ¶ 26; D. 124 ¶¶ 63, 65.  Renzullo came up from the basement, looked outside the windows on the first floor and saw the two officers outside his home.  D. 124 ¶ 61; D. 135 ¶ 61; D. 118 ¶ 40; D. 137 ¶ 40.  Grace and Ryan left the premises when it was apparent that Renzullo would not come to the door and drove down the street so they could keep an eye on his residence.  D. 124 ¶¶ 70–71; D. 135 ¶¶ 70–71.

Renzullo called his attorney, Marc Chapdelaine ("Chapdelaine").  D. 118 ¶ 41; D. 137 ¶ 41; D. 124 ¶ 73; D. 135 ¶ 73.  Chapdelaine called the WPD and spoke with Anderson, the office in charge ("OIC").  D. 118 ¶¶ 2, 46; D. 137 ¶¶ 2, 46; D. 124 ¶¶ 75–76; D. 135 ¶¶ 75-76.  Anderson told Chapdelaine that the Officers had been at Renzullo's home to serve him with the 209A Order and some other paperwork and that the reason for the police presence was that Renzullo had firearms registered to him.  D. 118 ¶ 47; D. 137 ¶ 47;  D. 124 ¶¶ 80–81; D. 135 ¶¶ 80-81.  Anderson stated that Chapdelaine needed to tell Renzullo to come out and be served and that he would send his officers back to the house.  D. 118 ¶ 47; D. 137 ¶ 47; D. 124 ¶ 82; D. 135 ¶ 82.

Chapdelaine called Anderson back and told him that Renzullo was taking his children to 5:00 p.m. soccer tryouts and would head over to the WPD police station to pick up the paperwork after he did so.  D. 118 ¶ 51;  D. 137 ¶ 51; D. 124 ¶ 84; D. 135 ¶ 84.  Anderson replied that this would not work because the Officers needed to seize his firearms from his residence.  D. 118 ¶ 51; D. 137 ¶ 51; D. 124 ¶ 86; D. 135 ¶ 86.  Anderson then advised Chapdelaine to call Renzullo back so he would not get arrested for violating the 209A Order.  D. 118 ¶ 51; D. 137 ¶ 51; D. 124 ¶ 87; D. 135 ¶ 87.  Chapdelaine continued to negotiate a time, proposing 5:30 p.m. or 5:45 p.m. so that Renzullo could get P.R. and B.R. to soccer tryouts.  D.

4

124 ¶ 88; D. 135 ¶ 88; see D. 118 ¶ 52; D. 137 ¶ 52.  Anderson told Chapdelaine that if Renzullo had come to the door and not "dodge[d] service," he could have dropped his children off.  D. 118 ¶ 52; D. 137 ¶52; D. 124 ¶ 89; D. 135 ¶ 89.  Anderson suggested having Renzullo come outside, and a nearby officer would come to the house, provide him with the 209A Order, and the officer would have him drop off his children, return to the home and then seize the firearms. D. 118 ¶ 53; D. 137 ¶ 53; D. 124 ¶ 91; D. 135 ¶ 91.  At some point during his conversation with Chapdelaine, Renzullo became aware of the existence of the 209A Order.  D. 118 ¶ 48; D. 124 ¶ 92.  The parties dispute, however, whether Renzullo was aware at this time that the 209A Order required him to surrender his firearms to the WPD.  See id.; D. 135 ¶ 92; D. 137 ¶ 48.

Seeing that the police had left, Renzullo put his children in his car and set out to drive them to soccer tryouts.  D. 118 ¶ 49; D. 137 ¶ 49; D. 124 ¶¶ 96–97; D. 135 ¶¶ 96-97.  At 4:56 p.m., Ryan radioed the WPD to report that he and Grace were going to follow Renzullo to drop his daughter off at soccer tryouts and then follow him back to the house.  D. 118 ¶ 57; D. 137 ¶ 57.  Shortly thereafter, Anderson got on the call and ordered Ryan and Grace to stop Renzullo "and serve him with the order at least."  D. 118 ¶ 57; D. 137 ¶ 57.  Ryan and Grace stopped the Plaintiffs on the 128 Northbound Ramp at Exit 42 Salem Street in Wakefield.  D. 118 ¶ 61; D. 137 ¶ 61.  Grace ordered Renzullo to show his hands and unlock the door.  D. 124 ¶ 118; D. 135 ¶ 118; D. 133 ¶¶ 107, 115.  Renzullo then said, "I thought I was supposed to go down to the police station at 5:30."  D. 124 ¶ 119; D. 135 ¶ 119; D. 133 ¶ 110.

The parties dispute how Renzullo was arrested. According to Plaintiffs, when Renzullo started to open his door with his right hand, Grace forcefully grabbed him, pulled him violently out of the car and immediately threw him to the ground on his stomach. D. 133 ¶ 143. While on the ground, multiple officers jumped on Renzullo's back, Grace put his knee on the back of his

neck with such force that he could not breathe and Renzullo had to yell out several times that he could not breathe before Grace took his knee off his neck.  Id. ¶ 144.  After his arms were handcuffed behind him, Grace got on his back with his knees, grabbed his elbow, yanked it and said this is for not letting us in your house.  Id. ¶ 145.

According to Defendants, Grace attempted to grab Renzullo's hands that were outside the driver's open window to secure control of Renzullo, but he pulled his hands back in the vehicle. D. 124 ¶¶ 128–29.  Although Renzullo did not comply with an order to unlock the door, ultimately, the driver's door was unlocked and opened.  Id. ¶ 131.  Ryan and Grace removed Renzullo from the vehicle and briefly placed him on his stomach so he could be contained and handcuffed.  Id. ¶¶ 132–33.  Morales arrived on the scene to assist Grace and Ryan and observed Renzullo with his hands in front of him trying to push himself up.  Id. ¶¶ 134–36; D. 135 ¶¶ 134-36.  According ot Morales, unsure of whether Renzullo had a firearm on his person, approached and put his knee on Renzullo's back and his hand on Renzullo's head in a technique to gain control of him.  D. 124 ¶¶ 137-38.

Renzullo was charged with failure to stop for police, negligent operation of a motor vehicle and resisting arrest.  D. 124 ¶ 151; D. 135 ¶ 151; see D. 134-14 at 2.  He was never charged with violation of the 209A Order.  D. 118 ¶ 61; D. 137 ¶ 61.  Renzullo was released on personal recognizance and he was given a copy of the 209A Order and documents pertaining to his court appearance based on his charges.  D. 124 ¶¶ 161–62; D. 135 ¶¶ 161–62.  Morales transported Renzullo back to his home where Grace, Ryan and two other police officers were present, intending to seize his firearms.  D. 124 ¶¶ 163–65;  D. 135 ¶¶ 163-65; D. 133 ¶ 181.  Renzullo initially refused to let the Officers into his home, then stated he would let one officer inside.  D. 124 ¶ 166; D. 135 ¶ 166; D. 133 ¶ 182.  Renzullo then said he would go in and get his

guns and bring them outside to the Officers.  D. 124 ¶ 167; D. 135 ¶ 167; D. 133 ¶ 184.  The Officers refused to let Renzullo obtain unsecured firearms and return to them; instead, several officers accompanied him into his home.  D. 124 ¶ 168;  D. 135 ¶ 168; D. 133 ¶¶ 184–85. Renzullo gave the police the combinations to a gun safe and turned over several firearms and boxes of ammunition.  D. 124 ¶¶ 169, 172–73; D. 135 ¶¶ 169, 172-73; D. 133 ¶¶ 172–73, 188. The next morning, Renzullo went to a hospital where he was diagnosed with a fractured elbow. D. 124 ¶ 157; D. 135 ¶ 157; D. 133 ¶ 189.

## IV.    Procedural History

Plaintiffs commenced this action on October 30, 2020, D. 1, and later filed an amended complaint, D. 80.  The parties stipulated to the dismissal by P.R. and B.R. of their intentional infliction of emotional distress claim (Count IX),  D. 91, and Plaintiffs have abandoned their 42 U.S.C. § 1983 claims as to any alleged violation of the Sixth Amendment.  D. 132 at 12.  The Court heard the parties on the cross motions for summary judgment and took these matters under advisement.  D. 141.

## V.    Discussion

### A.    Plaintiffs' 42 U.S.C. § 1983 Claims (Counts I, II and III)

#### 1.    *Count I*

Count I advances a 42 U.S.C. § 1983 claim against Defendants in their individual capacities and is premised on the Fourth, Fifth and Fourteenth Amendments.  D. 80 at 19–20. "A claim under section 1983 has two essential elements.  First, the challenged conduct must be attributable to a person acting under color of state law . . . [and] second, the conduct must have worked a denial of rights secured by the Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).  There is no dispute that the Officers acted under color of state

law at all points relevant to the events underlying this litigation.  The Court's inquiry, therefore, focuses on whether the Officers' stop of Plaintiffs, arrest of Renzullo and alleged actions following the arrest violated the Fourth, Fifth and Fourteenth Amendments.

a)    Fourth Amendment – Whether the Vehicle Stop Was Unreasonable

A police stop of an automobile constitutes a seizure and must be reasonable in order to comply with the Fourth Amendment.  Brendlin v. California, 551 U.S. 249, 254-55 (2007) and cases cited.    A  seizure  conducted  without  a  warrant  is  presumptively  unreasonable. Commonwealth v. Sanborn, 477 Mass. 393, 395 (2017) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  "[Gen. L.] c. 209A cannot authorize a stop in the absence of a constitutional justification,  such  as  a  warrant,  reasonable  suspicion  of  criminal  activity  or  a  civil  traffic violation, or a reasonable belief that emergency intervention is required,"  Id. at 395–96, the latter of which is a "constitutional exception to the warrant requirement," id. at 396, which would focus on "whether a stop to serve a c. 209A order is a reasonable measure to avert the harm from an emergency depends on an objective assessment of the necessity of doing so, in light of all facts known to law enforcement at the time."  Id.  In non-exigent circumstances, whether a "stop was based on an officer's reasonable suspicion that the person was committing, had committed or was about to commit a crime" must be grounded in "specific, articulable facts and reasonable inferences [drawn] therefrom rather than on a hunch."  Commonwealth v. Meneus, 476 Mass. 231, 235 (2017) (alteration in original) (citations and internal quotation marks omitted); Terry v. Ohio, 391 U.S. 1, 21-22 (1968).

A violation of a 209A order requires proof that "(1) a valid G. L. c. 209A order was entered by a judge and was in effect on the date of the alleged violation, (2) the individual violated  the  terms  of  the  order  and  (3)  the  defendant  had  knowledge  of  the  order."

Commonwealth v. Tiernan, 96 Mass. App. Ct. 588, 590 (2019) (citing Commonwealth v. Silva, 431 Mass. 401, 403–404 (2000)). "Intent to violate the order is not necessary and the statute 'requires no more knowledge than that the defendant knew of the order.'" Id. (citing Commonwealth v. Telcinord, 94 Mass. App. Ct. 232, 241 n.17 (2018)). Evidence that an individual received actual or constructive notice can be used to meet the knowledge element. Id. Evidence that an individual was put on sufficient notice to make reasonable inquiry concerning the issuance and terms of the order can also be used to meet the knowledge element. See Commonwealth v. Gonsalves, 99 Mass. App. Ct. 638, 640 (2021).

Here, it is undisputed that Grace and Ryan stopped Plaintiffs in Renzullo's vehicle without a warrant. See D. 118 ¶ 61; D. 137 ¶ 61; D. 124 ¶ 105. As a preliminary matter, Defendants argue that P.R. and B.R. were not the subjects of an unreasonable seizure and have no viable claims against the Officers under the Fourth Amendment. D. 123 at 5. However, it is well established that "[a] passenger in a vehicle may challenge the constitutionality of a stop." Buckley, 478 Mass. at 865 (citation omitted); United States v. Campbell, 741 F.3d 251, 260 (1st Cir. 2013) (citing Brendlin v. California, 551 U.S. 249, 251 (2007)) (second citation omitted); see Cox v. Vill. of Pleasantville, 271 F. Supp. 3d 591, 605 (S.D.N.Y. 2017) (discussing Brendlin and stating "there is no question in this case that when [a police officer] stepped in front of the vehicle and induced [a driver] to decelerate the vehicle in an effort to stop (and thereby submit to the authority of [the officer]), a seizure was effected as to all passengers in the car"). B.R. and P.R., therefore, have standing to challenge the warrantless, stop of Renzullo's vehicle.

There is a genuine factual dispute as to whether the officers had reasonable suspicion to believe that Renzullo had or was about to commit a crime, namely violation of the 209A Order. Among other things, the 209A Order required Renzullo to "immediately surrender to the [WPD]

or to the police officer serving this order all guns, ammunition, gun licenses and FID cards."  D.

120-13 at 1.   It is undisputed that Renzullo learned of the 209A Order after his phone

conversation with Chapdelaine before he got into his vehicle and left his home.  See D. 118 ¶ 48;

D. 124 ¶ 92.    The parties dispute whether Renzullo had actual knowledge that the 209A Order

required him to immediately surrender his firearms before he got in his vehicle.  See D. 118 ¶ 48;

D. 124 ¶ 92.  The law, however, does not require that one have actual knowledge of the terms of

an order to violate it.  "[T]he statute . . . requires no more knowledge than that the defendant

knew of the order."  Telcinord, 94 Mass. App. Ct. 232, 241 n.17 (2018) (quoting Com. v.

Delaney, 425 Mass. 587, 596–97 (1997)) (omission in original) (internal quotation marks

omitted).   Furthermore, evidence that an individual was put on sufficient notice to make

reasonable inquiry concerning the issuance and terms of the order can be used to meet the

knowledge element.  See Gonsalves, 99 Mass. App. Ct. 638, 640-41 (2021) (holding that a jury

could have found that a defendant's knowledge of the existence of a 209A order and awareness

that the police were trying to serve him with it would have prompted a reasonable person to

make inquiry of its terms).

Given that Renzullo was aware of the police presence at his home and had been in

communication with his attorney regarding the 209A Order, a reasonable jury could find that

Renzullo had sufficient notice to inquire of his attorney before he got into his car that the 209A

Order required him to surrender his weapons immediately.  Further, given that Ryan testified that

he observed Renzullo speed out of his driveway and that he believed Renzullo intended to leave

the city once he merged onto the 128 North ramp, D. 134-4 at 25, 28, a reasonable jury could

find that the Officers had reasonable suspicion that Renzullo violated, or was about to violate,

the 209A Order in this respect.  On the other hand, there is evidence for a reasonable jury to find

that the Officers did not have reasonable suspicion that Renzullo had violated, or was about to

violate, the 209A Order before they stopped him.   The record shows that at 4:56 p.m., Ryan

radioed the WPD to report that he and Grace were going to follow Renzullo to drop his daughter

off at soccer tryouts and then follow him back to his home.  D. 118 ¶ 57; D. 124 ¶ 109.  Less

than two minutes later, Anderson ordered Ryan and Grace to stop Renzullo.  D. 133 ¶ 56.  Ryan

testified that as soon as Anderson ordered them to stop Renzullo, he and Grace immediately

"turned on the lights and sirens and attempted to stop him."  D. 118 ¶ 64; see D. 134-4 at 28.  It

is not clear that there were specific, articulable facts for Anderson, Ryan or Grace at the time of

the stop to suspect that Renzullo was violating, had violated or was about to violate the 209A

Order.  See Meneus, 476 Mass. at 235.[1]

 Accordingly, there is a triable issue as to whether the Officers had reasonable suspicion

to stop Renzullo for violating the 209A Order.

---

[1] To the extent that Defendants argue, alternatively, that the exigent circumstances exception to
the Fourth Amendment's warrant requirement applies, that exception "applies when 'there is
such a compelling necessity for immediate action as will not brook the delay of obtaining a
warrant.'"  Matalon v. Hynnes, 806 F.3d 627, 636 (1st Cir. 2015) (quoting Fletcher v. Town of
Clinton, 196 F.3d 41, 49 (1st Cir. 1999)).  Relevant scenarios include "hot pursuit of a fleeing
felon" or "a threat, posed by a suspect, to the lives or safety of the public, the police officers, or
to [him]self."  Id. (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995))
(internal quotation marks omitted).  "Relatedly, a subset of the exigent circumstances rubric
covers 'emergency aid.'"  Id. (quoting United States v. Martins, 413 F.3d 139, 147 (1st Cir.
2005)).

 Here, the record does not support a finding that exigent circumstances existed to stop
Renzullo.  While the 209A Order commanded Renzullo to stay 100 yards away from Paula, D.
120-13, there is no evidence that the Officers suspected that Renzullo was on his way to Paula's
home or workplace when he was stopped.  Indeed, Defendants do not argue that the Officers
suspected that Renzullo posed a danger to the lives or safety of the public, the police officers or
to himself prior to the stop, Matalon, 806 F.3d at 636, other than their reasonable suspicion that
he had or was about to violate the 209A Order as addressed above.

> b)   Fourth Amendment – Whether Defendants Had Probable Cause to
>       Arrest Renzullo

Plaintiffs allege that Defendants violated their Fourth Amendment right to be free from arrest unsupported by probable cause.  D. 80 at 20.  Under the Fourth Amendment, "the right to be free from unreasonable searches gives rise to a requirement that an arrest be supported by probable cause."  Nuon v. Lowell, 768 F. Supp. 2d 323, 329 (D. Mass. 2011) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  "Probable cause exists where 'the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'"  Id. (alterations in original) (quoting United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987)).

Similar to the analysis above regarding reasonable suspicion for the stop, there is a genuine factual dispute as to whether the Officers had probable cause to arrest Renzullo for violating the 209A Order.  As explained above, it is not clear from the record whether the facts and circumstances within the Officers' knowledge were sufficient to warrant a prudent officer in believing that Renzullo had violated the 209A Order.  See Nuon, 768 F. Supp. 2d at 329.  On Plaintiffs' facts, a reasonable jury could find that the Officers did not have probable cause to arrest Renzullo because he had neither violated the 209A Order nor resisted arrest; on Defendants' facts, a reasonable jury could make the opposite finding.  Therefore, there is a triable issue with respect to Renzullo's claim of false arrest.

> c)   Fourth Amendment – Whether the Officers Used Excessive Force

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."  McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (citing Plumhoff v. Rickard, 572 U.S. 765, 774 (2014)).

"[D]etermining the . . . reasonableness of a particular seizure . . . 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  Id. (quoting Graham, 490 U.S. at 396). "Determining whether a particular use of force is reasonable requires consideration of the totality of the circumstances."  Gray v. Cummings, 917 F.3d 1, 8 (1st Cir. 2019) (citing Graham, 490 U.S. at 396).   "This consideration entails the weighing of a myriad of factors such as 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight.'"  Id. (alterations in original).   "This reasonableness inquiry is an objective one; it is not a question of subjective intent."  McGrath, 757 F.3d at 25 (citing Graham, 490 U.S. at 397).   "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397.   "Courts assess the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Kenney, 700 F.3d at 609 (quoting Graham, 490 U.S. at 396).

As a preliminary matter, there is no evidence that the Officers used any force against B.R. or P.R.   Therefore, this claim fails as to them.   There, however, is a genuine dispute as to whether the Officers used excessive force in arresting Renzullo.   As discussed above, the parties have presented materially different versions of how Renzullo was arrested.   See D. 133 ¶¶ 143–45; D. 124 ¶¶ 128–36.   On Plaintiffs' alleged facts, a reasonable jury could find that the force used by the Defendants was excessive because Renzullo posed no immediate threat to the safety of the Officers, was not actively resisting arrest nor attempting to evade arrest by flight.   See Gray, 917 F.3d at 8.   On Defendants' alleged facts, a reasonable jury could find that the Officers

used an appropriate amount of force given their uncertainty about whether Renzullo was armed and their claim that Renzullo was actively resisting arrest. There is, therefore, a triable issue with respect to Renzullo's claim of excessive force.

Accordingly, the Court allows Defendants' motion as to Count I as to P.R. and B.R.'s claim of excessive force under the Fourth Amendment. The Court otherwise denies Defendants' motion as to Count I as to Plaintiffs' claims under the Fourth Amendment and denies Plaintiffs' motion as to the same.

d)    Fifth Amendment and Fourteenth Amendment

"Where, as here, a plaintiff's substantive due process claims challenge the constitutionality of certain . . . acts, 'the plaintiff must show both that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property.'" Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (citations omitted) (emphasis in original).

> "There is no scientifically precise formula for determining whether executive action is—or is not—sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment." However, certain principles have emerged from the case law. Executive acts that shock the conscience must be "truly outrageous, uncivilized, and intolerable,' and 'the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." Indeed, "[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."

Id. (alterations in original) (citations omitted). As such language makes clear, "the Supreme Court has been firm in its reluctance to expand the doctrine of substantive due process." Marrero-Rodriguez v. Municipality of San Juan, 677 F.3d 497, 502 (1st Cir. 2012) (citation and internal quotation marks omitted). Indeed, the various formulations of the "shock the

conscience" standard deliberately set the bar high "to protect the Constitution from demotion to merely a 'font of tort law.'" Cummings v. McIntire, 271 F.3d 341, 344 (1st Cir. 2001) (quoting Cnty. Of Sacramento v. Lewis, 523 U.S. 833, 847–48 (1998)).

In Cummings, the First Circuit collected a series of cases where plaintiffs established the requisite level of egregious, conscious shocking behavior to substantiate a substantive due process violation. Cummings, 271 F.3d at 346 and cases cited. These cases illuminate "serious physical intrusions or sustained abuse" that typify substantive due process violations. Id. Here, even viewing the evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Defendants violated Plaintiffs' substantive due process rights under the Fifth or Fourteenth Amendments.[2] Plaintiffs claim that Ryan, Grace, Morales and Silva forced their way into Renzullo's home, on threats of arrest and injury, to get his firearms despite Renzullo's offer to surrender them, that the Officers transported B.R. and P.R. after he was arrested and then entered his home without his permission and that Silva told B.R. and P.R. to change their clothes in front of him and would not let them move about their house freely. D. 132 at 10. Plaintiffs further claim that Anderson ordered the vehicle stop in retaliation for Renzullo exercising his constitutional rights, that he intentionally falsified a police report by omitting exculpatory information about Renzullo's true criminal history and that during booking, he threatened to throw Renzullo in a cell overnight so he would not be able to see his children if he complained of any injuries to the EMTs. Id. at 11–12. These claims, even if true, do not involve "serious

---

[2] To the extent that Plaintiffs argue that "any force during an unconstitutional stop is excessive" or that "a jury could find that the particular force inflicted upon the Plaintiffs by Grace, Ryan, Morales and Silva at the stop . . . was outrageous and egregious and conscience-shocking," D. 132 at 11, it has been well established by the Supreme Court that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham, 490 U.S. at 395 (emphasis in original).

physical intrusions or sustained abuse" that typify substantive due process violations.  See Cummings, 271 F.3d at 346.

Furthermore, although the First Circuit has left open the possibility that non-physical harassment and intimidation could "shock the conscience" and violate an individual's substantive due process rights, Correia v. Town of Framingham, 969 F. Supp. 2d 89, 96 (D. Mass. 2013) (citing Cruz–Erazo v. Rivera–Montanez, 212 F.3d 617, 624 (1st Cir. 2000)), the Officers' alleged conduct was not "so disproportionate to the need presented, and so inspired by malice or sadism . . . [such] that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."  Harron, 660 F.3d at 536 (citation omitted); see Cruz–Erazo, 212 F.3d at 618–20, 623.  While Defendants' alleged actions and motivations would "unquestionably [be] inconsistent with [their] public responsibilities as [police officers] and [would] deserve[] condemnation," Cummings, 271 F.3d at 347, this conduct does not rise to the level of "the most egregious official conduct [that] can be said to be 'arbitrary in the constitutional sense'" Id. (citing Lewis, 523 U.S. at 846).

Accordingly, the Court allows Defendants' motion as to Count I as to Plaintiffs' claims under the Fifth and Fourteenth Amendments.

   2.    *Count II*

Plaintiffs allege that Defendants conspired to deprive them of their civil rights in violation of Section 1983.  D. 80 at 20–21.  A civil rights conspiracy under Section 1983 "is commonly defined [as] 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'"  Sanchez v. Foley, 972 F.3d 1, 11 (1st Cir. 2020) (alteration in

original) (quoting Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008)).  "To establish a civil rights conspiracy, a plaintiff must show 'not only a conspiratorial agreement but also an actual abridgment of some federally-secured right.'"  Id. (quoting Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001)).

a)      Agreement

To establish the first element of a Section 1983 conspiracy, "an agreement among the members of the conspiracy," the plaintiff must prove either the existence of "a 'single plan[,] the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences,' or '[a]t the least' that 'the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly.'"  Id. at 12 (alterations in original) (quoting Aubin v. Fudala, 782 F.2d 280, 286 (1st Cir. 1983).  "While there must be sufficient evidence from which a reasonable jury can infer an agreement 'without speculation and conjecture,' a plaintiff need not present direct evidence of the agreement."  Id. (quoting Earle v. Benoit, 850 F.2d 836, 844–45 (1st Cir. 1988)).  "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof:  more often than not such an agreement must be inferred from all the circumstances."  Id. (quoting Earle, 850 F.2d at 843).

Here, there is a genuine dispute as to whether Defendants conspired to stop and arrest Renzullo in violation of his constitutional rights.  It is undisputed that Anderson instructed Ryan and Grace to stop Renzullo and serve him with the 209A Order.  See D. 118 ¶ 57; D. 124 ¶ 109. It is undisputed that Anderson, Grace and Ryan were aware that B.R. and P.R. were in the vehicle with Renzullo.  D. 118 ¶¶ 54, 65; D. 137 ¶¶ 54, 65.  There is also no dispute that the other Officers later arrived at the scene to assist Ryan and Grace in seizing the Plaintiffs.  See D.

124 ¶¶ 121–22, 134–36.   Although Defendants claim that they stopped Renzullo because he violated the 209A Order, Plaintiffs have presented contrary evidence that the Officers agreed to seize Plaintiffs because Renzullo deliberately "dodge[d] service."   See D. 124 ¶ 89; see also D. 133 ¶ 145 (stating that after Renzullo's arms were handcuffed behind him, Grace got on his back with his knees, grabbed his elbow, yanked it and said this is for not letting us in your house). Therefore, a reasonable jury could accept Plaintiffs' version of events and infer that the Officers had agreed to seize them because Renzullo did not accept service when they were at his home, later fabricating the 209A Order violation as the reason why they seized them.   See Santiago, 891 F.2d at 389 (concluding that trial court erred in directing a verdict for defense on a conspiracy claim where "[i]f the jury believed that there was no probable cause for the arrest and that the officers' story was fabricated, a reasonable jury could have believed that a conspiracy existed to arrest [plaintiff] illegally").

> b) Deprivation of a Federally Secured Right: The Stop, Arrest and Alleged Use of Excessive Force by the Officers

It is a triable issue whether the Officers deprived Plaintiffs of their federally secured rights. See Foley, 972 F.3d at 11.   As discussed above, a reasonable jury could find for either Plaintiffs or Defendants on whether they had a constitutional justification for stopping and arresting Plaintiffs without a warrant or  used excessive force while doing so.   Accordingly, the Court denies Plaintiffs' motion as to Count II and denies Defendants' motion as to the same.

> 3. Count III—Monell claim against Wakefield

Plaintiffs claim that Wakefield fostered customs and practices that directly contributed to the deprivations of their constitutional rights.   D. 80 at 21–22.   There are two requirements for plaintiffs to meet in maintaining a Section 1983 claim based on an unconstitutional municipal custom.   First, the custom or practice must be attributable to the municipality.   Bordanaro v.

McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989).  Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights.  Id.

a)  Whether a Custom or Policy Attributable to Wakefield Exists

Plaintiffs have not produced sufficient evidence of a municipal custom or policy.  As to this element, "[t]he municipal policy may either be (1) an official policy articulated or adopted by a decision-maker; or (2) an unofficial custom as evidenced by widespread action or inaction." McElroy v. Lowell, 741 F. Supp. 2d 349, 353 (D. Mass. 2010) (citing Fletcher v. Town of Clinton, 196 F.3d 41, 55 (1st Cir. 1999) and Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690–91 (1978)).  Plaintiffs argue that Wakefield had a custom of using excessive force that was fostered by its failure to supervise and discipline its officers for prior misconduct. D. 132 at 12–15.  As evidence of this custom, Plaintiffs rely on a prior claim of excessive force against WPD brought before this court.  Id. at 13; see D. 134-2 at 20.  In that case, the plaintiff alleged that one officer put his knee, which felt like the officer's full weight, on the small of his back, pulled the plaintiff's arm behind him, marched him out of a store with his hands held together behind his head, causing him much pain, and subsequently handcuffed him even though he was complying with the officers' orders.  Niles v. Town of Wakefield, 172 F. Supp. 3d 429, 435–36 (D. Mass. 2016) (denying defendant's summary judgment motion in part and allowing it in part).  At the time of this incident, WPD Chief Richard Smith ("Smith") was the highest ranking sworn officer with final authority relative to establishing policies, procedures, rules and general orders for WPD.  D. 133 ¶ 6; see D. 124 ¶¶ 16–17.  Smith could not recall whether an investigation into either incident occurred or whether any officers were disciplined or retrained as a result.  D. 133 ¶ 191; see D. 134-2 at 9, 20–21.  Moreover, one of the lieutenants involved in the alleged misconduct in Niles was later promoted to chief.  D. 133 ¶ 192; see D. 134-2 at 21.

According to Plaintiffs, the lack of investigation or discipline following the <u>Niles</u> incident (and in the instant case) combined with the lieutenant's promotion are sufficient evidence that WPD had a custom that fostered the use of excessive force.  D. 132 at 13–15.

Even assuming *arguendo* that the claims of unlawful search and search, excessive force and related claims in <u>Niles</u> were meritorious,[3] courts have consistently inferred a municipal custom only where plaintiffs have produced more evidence than a single prior complaint.  In <u>Douglas v. City of Springfield</u>, No. 14-30210-MAP, 2017 WL 123422, at *4–6, 11 (D. Mass. Jan. 12, 2017), the court denied the city's summary judgment motion as to a <u>Monell</u> claim for failure to supervise or discipline where officers were each the subject of at least three, and as many as twenty, civilian complaints of excessive force.  In <u>Cox v. Murphy</u>, No. 12-11817-FDS, 2016 WL 4009978, at *4–7, 10 (D. Mass. Feb. 12, 2016), the court denied the city's summary judgment motion where hundreds of citizen complaints had been filed against police officers alleging improper use of force within a ten-year span and where the defendant officers were each the subject of multiple civilian complaints and/or multiple civil lawsuits.  And in <u>Semedo v. Elliott</u>, No. 10-11976-RWZ, 2012 WL 2449912, at *2 (D. Mass. June 28, 2012), the court denied summary judgment where the plaintiff claimed unlawful arrest and there were hundreds of complaints against individual officers.  Such is not the record here and the Court concludes that Plaintiffs have not produced sufficient evidence of a custom or policy attributable to Wakefield.

b)      <u>The Causal Link</u>

Because Plaintiffs have not presented sufficient evidence of a municipal custom or policy, the Court need not address the second requisite element, causation, for this claim.

Accordingly, the Court allows Defendants' motion as to Count III.

---

[3] <u>Niles</u> ultimately resolved by settlement between and stipulation of dismissal.  <u>See</u> <u>Niles v. Town of Wakefield</u>, 13-cv-13086-JGD, D. 89, D. 91 (D. Mass. Nov. 22, 2016).

**B.**   **Plaintiffs' Massachusetts Civil Rights Act Claims (Counts IV and V)**

Counts IV and V of the amended complaint advance claims under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. L. c. 12, §§ 11H & 11I, against Defendants in their individual capacities.  D. 80 and 22–23.  The MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation or coercion."  Mass. Gen. L. c. 12, § 11I.  "A 'threat' means 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm'; 'intimidation' means 'putting in fear for the purposes of compelling or deterring conduct'; and 'coercion' means 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" Pimentel v. Methuen, 323 F. Supp. 3d 255, 272 (D. Mass. 2018) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994)).  Although direct action violating a plaintiff's right by itself does not amount to a violation of the MCRA, if that "direct action also includes threats against, or intimidation or coercion of, a particular individual or individuals, liability under the MCRA can be established, and will be established if such threats, intimidation, or coercion interfered with that individual's exercise or enjoyment of rights secured by law." Blake, 417 Mass. at 473 (collecting and distinguishing cases involving "direct action against the plaintiff which by itself did not amount to a violation of the MCRA").

Other than the additional requirement that an interference or attempted interference was by threats, intimidation or coercion, "the [MCRA] is generally interpreted coextensively with" Section 1983.   Diaz v. Devlin, 229 F. Supp. 3d 101, 112 (D. Mass. 2017) (citation omitted). Since the Court has already discussed Plaintiffs' Section 1983 claims and concluded that some of

their Fourth Amendment claims survive, the focus of the Court's inquiry is whether the Officers interfered or attempted to interfere with those rights by threats, intimidation or coercion.

As a preliminary matter, there is no evidence that the Officers used threats, intimidation or coercion to violate B.R. or P.R.'s rights.  Therefore, these claims fail as to them.  Also, no reasonable jury could find that the Officers violated the MCRA as to Renzullo.  Plaintiffs argue that Anderson attempted to coerce Renzullo to come out of his house and accept service of the 209A Order with a threat of arrest.  D. 132 at 20.  It is undisputed that Anderson told Chapdelaine to tell Renzullo "to come out and accept the paperwork, and the officers would consider letting him take his children to soccer and come back for the seizure of the firearms." D. 124 ¶ 90; D. 135 ¶ 90.  It is also undisputed that "Anderson suggested having [Renzullo] come outside, and a nearby officer would come to the house, provide him with the order, and the officer would have him drop off his children, return to the home and then seize the firearms."  Id. ¶ 91.  Even viewed in light most favorable to Renzullo, the record supports a finding that prior to ordering the stop, Anderson suggested through communications with his attorney that Renzullo accept service and surrender his weapons, not coercion to do so. This record also does not support a finding that Anderson, outside of ordering the vehicle stop itself, intentionally exerted pressure to make Renzullo "fearful or apprehensive of injury or harm," "fearful for the purpose of compelling or deterring conduct" or that he applied "such force, either physical or moral, as to constrain" Renzullo to do something he "would not otherwise have done."  See Gallagher v. S. Shore Hosp., Inc., 101 Mass. App. Ct. 807, 825 (2022) (citations omitted).

Nor is there sufficient evidence that the Officers threatened, intimidated or coerced Renzullo into giving up a right after he had been arrested.  According to Plaintiffs, while at the police station, Renzullo complained to Anderson that he was in a lot of pain, that his head, arm

and shoulder hurt, that he felt dizzy and that Anderson told him that if he told the EMTs that he was hurt, he would be sent to the hospital in handcuffs, it would take hours and when he came back to the station, they would lock him up and he would not see his children.  D. 133 ¶ 180. Later, when the Officers brought Renzullo back to his home to seize the firearms, Plaintiffs claim Grace told Renzullo to sit on the "f'ing couch" and not to move or he would "break his other arm."  Id. ¶ 186.  Even considering the record in the light most favorable to Plaintiffs, they have not sufficiently established a deprivation of Renzullo's legal rights stemming from these words.  See Broderick v. Roache, 803 F. Supp. 480, 486 (D. Mass. 1992) (stating "[t]o violate MCRA there must be, in addition to the deprivation itself, something akin to duress which causes the victim to relinquish her rights") (citation and internal quotation marks omitted).

Accordingly, the Court allows Defendants' motion as to Counts IV and V.

### C.     Plaintiffs' Other State Law Claims

#### 1)  Count VI—False Imprisonment

Count VI of the amended complaint advances a claim of false imprisonment against the Officers in their individual capacities.  D. 80 at 23–24.  Under Massachusetts law, "[t]he tort of false imprisonment consists of the (1) intentional and (2) unlawful (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement."  Nuon, 768 F. Supp. 2d at 336 (internal citations and quotation marks omitted).

The Court has already determined that there is a genuine factual dispute as to whether the Officers had reasonable suspicion to seize Plaintiffs or probable cause to arrest Renzullo. Similarly, there is a triable issue as to whether the Officers' intentional restraint of Renzullo (via the vehicle stop and arrest) and of B.R. and P.R. (via the vehicle stop) was unjustified and

unlawful.   Summary judgment, therefore, is not warranted on Plaintiffs' claim of false imprisonment.

Accordingly, the Court denies Defendants' motion as to Count VI.

### 2)   Count VII—Assault and Battery

Plaintiffs bring a claim of assault and battery against the Officers in their individual capacities.  D. 80 at 24.  Where a plaintiff brings both a Section 1983 excessive force claim and a common law claim for assault and battery, the Court's determination of the reasonableness of the force used with respect to the Section 1983 claim controls its assault and battery analysis.  Eason v. Alexis, 824 F. Supp. 2d 236, 241 (D. Mass. 2011) (citing Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010)).  The Court has already determined in its Section 1983 analysis that there is a triable issue as to whether the Officers used excessive force against Renzullo and that there is insufficient evidence for the same as to B.R. and P.R.   Accordingly, the Court allows Defendants' motion as to Count VII as to B.R. and P.R. and denies the motion as to Renzullo.

### 3)   Count VIII—Malicious Prosecution

Renzullo brings a claim of malicious prosecution against the Officers in their individual capacities.  D. 80 at 24–25.  "To make out a claim for malicious prosecution, a plaintiff must prove: (1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff." Alvarez v. City of Worcester, 450 F. Supp. 3d 74, 80 (D. Mass. 2020) (quoting Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 405 (2002)).   "[T]he relevant determination in a malicious prosecution claim is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced."   Gutierrez, 437 Mass. at 406 (citation and internal quotation marks omitted).   "Generally, where there is probable cause to

arrest, the plaintiff has failed to meet the probable cause element of malicious prosecution." Id. at 405 (citations omitted).

It is undisputed that Defendants instituted criminal process against Renzullo and that this proceeding terminated in Renzullo's favor. See D. 80 ¶¶ 78, 137. Renzullo must still establish that the proceedings were instituted against him with malice and that the Officers lacked probable cause to bring those charges.

a)    Whether the Officers Instituted Proceedings with Malice

To succeed on a claim of malice in a malicious prosecution action, Plaintiffs must demonstrate that the Officers (1) "knew that there was no probable cause for the prosecution" and (2) "personally acted with an improper motive." See Beecy v. Pucciarelli, 387 Mass. 589, 593 (1982) (citations omitted).

Here, there is a triable issue as to whether Defendants instituted proceedings against Renzullo with malice. As discussed above, Plaintiffs have presented evidence that the Officers arrested Renzullo not with the requisite probable cause that he had or was about to commit a crime, but because he deliberately "dodge[d] service" of the 209A Order. See D. 118 ¶ 52; D. 124 ¶ 89; D. 135 ¶ 89; see also D. 133 ¶ 145 (stating that after his arms were handcuffed behind him, Grace got on his back with his knees, grabbed his elbow, yanked it and said this is for not letting us in your house). Moreover, even though the Officers claim that they stopped Renzullo because they had probable cause that he had violated the 209A Order, this was not one of the charges brought against Renzullo. D. 124 ¶ 151; D. 135 ¶ 151; D. 133 ¶ 64; see D. 134-14 at 2. On these facts, a reasonable jury could find that the Officers instituted proceedings against Renzullo with "no probable cause for the prosecution" and with "an improper motive." See Beecy, 387 Mass. at 593 (citations omitted).

25

b)     Whether the Officers Had Probable Cause

Defendants argue that they had probable cause to arrest Renzullo and thus his malicious prosecution claim fails under the second element.  D. 123 at 25.  However, as discussed above, there is a triable issue as to whether the Officers had probable cause to arrest Renzullo.  Thus, Plaintiffs have produced sufficient evidence for a reasonable jury to find that the Officers maliciously prosecuted Renzullo.

Accordingly, the Court denies Defendants' motion as to Count VIII.

4)   Count IX—Intentional Infliction of Emotional Distress

Renzullo also brings a claim of intentional infliction of emotional distress against the Officers in their individual capacities.  D. 80 at 25–26.

> To sustain a claim of intentional infliction of emotional distress, the plaintiff must show that the defendant intended to cause, or should have known that his conduct would cause, emotional distress, that the defendant's conduct was extreme and outrageous, and that such conduct caused the plaintiff to suffer severe distress. To be considered extreme and outrageous, the defendant's conduct must be "beyond all bounds of decency and . . . utterly intolerable in a civilized community."

Sena v. Com., 417 Mass. 250, 263–64 (1994) (omission in original) (citations omitted).

Renzullo's intentional infliction of emotional distress claim fails for the same reasons as his substantive due process claim.  See Stoot v. City of Everett, 582 F.3d 910, 930 (9th Cir. 2009) (equating standard for substantive due process with that for intentional infliction of emotional distress).  As discussed above, the record, even when viewed in the light most favorable to Renzullo, does not contain evidence of extreme and outrageous conduct "beyond all bounds of decency and . . . utterly intolerable in a civilized community."  See Sena, 417 Mass. at 263-64.

Accordingly, the Court allows Defendants' motion as to Count IX.

### D.   <u>Whether Officers are Entitled to Qualified Immunity</u>

Defendants argue that the Officers are protected from liability by qualified immunity because any constitutional violations were not of clearly established statutory or constitutional rights of which a reasonable person in their position would have known.  D. 123 at 16.  "Though the sweep of qualified immunity is broad, it does not protect those officials who, from an objective standpoint, should have known that their conduct was unlawful."  <u>Cordero v. Pack</u>, 368 F. Supp. 3d 137, 151 (D. Mass. 2019) (quoting <u>Alfano v. Lynch</u>, 847 F.3d 71, 75 (1st Cir. 2017)).  "We 'employ a two-prong analysis' to determine whether an officer is protected by qualified immunity."  <u>Mitchell v. Miller</u>, 790 F.3d 73, 77 (1st Cir. 2015) (quoting <u>Mlodzinski v. Lewis</u>, 648 F.3d 24, 32 (1st Cir. 2011)).  "We first determine 'whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right.'"  <u>Id.</u>  "If such a violation is shown, we then determine whether the law 'was clearly established at the time of the defendant's alleged violation.'"  <u>Id.</u>

### a)   <u>Anderson</u>

Viewing the facts in the light most favorable to Plaintiffs, Anderson ordered Ryan and Grace to stop and serve Renzullo with the 209A Order on the highway even though Grace and Ryan were following Renzullo to soccer tryouts and that Renzullo would surrender his weapons and accept service of the 209A Order after he dropped off his daughter.  <u>See</u> D. 118 ¶ 57; D. 124 ¶¶ 98–100, 107–109.  A reasonable jury could find that Anderson could not have reasonably suspected that Renzullo had violated or was about to violate the 209A Order's requirement that he immediately surrender his firearms to the police department.  Moreover, it was well established that the Fourth Amendment prohibited a warrantless seizure to serve a 209A Order "in the absence of a constitutional justification, such as . . . reasonable suspicion of criminal

activity or a civil traffic violation, or a reasonable belief that emergency intervention [was] required." Sanborn, 477 Mass. at 395–96. Anderson is, therefore, not entitled to qualified immunity with respect to Plaintiffs' claim of unreasonable seizure.

b)      Grace

With respect to unreasonable seizure, the Court's analysis above for Anderson similarly applies to Grace as one of the Officers who carried out the stop. Moreover, were a reasonable jury to credit Plaintiffs' version of events, see D. 133 ¶¶ 143–45, it could also find that Grace lacked probable cause to arrest Renzullo. It was well established that a warrantless arrest unsupported by probable cause violated the Fourth Amendment. United States v. Cruz Jimenez, 894 F.2d 1, 4 (1st Cir. 1990). Grace is, therefore, not entitled to qualified immunity on Plaintiffs' claim of unreasonable seizure.

With respect to excessive force, viewing the facts in the light most favorable to Plaintiffs, Grace approached Renzullo's vehicle with his gun drawn, pointed the gun ten inches from Renzullo's face, forcefully grabbed him, pulled him violently out of the car, immediately threw him to the ground on his stomach, pushed his face into the cement by choking his neck with his knee with such force that Renzullo could not breathe resulting in a concussion and grabbed his elbow and yanked it resulting in a fractured elbow even though he was not resisting arrest. D. 133 ¶¶ 107, 112, 143–45; D. 134-9 at 12, 40. A reasonable jury could find that Grace used more force than was objectively reasonable under the circumstances. See Cocroft v. Smith, No. 10-40257-TSH, 2013 WL 1336304, at *5 (D. Mass. Mar. 29, 2013) (denying summary judgment where there was sufficient evidence that a police officer hurled a suspect arrested for disorderly conduct to the ground, painfully pulled her arms behind her, put his knee directly onto her back, applied his weight and ignored her pleas that she could not breathe). Grace is, therefore, not

entitled to qualified immunity with respect to Plaintiffs' claim of unreasonable seizure or Renzullo's claim of excessive force.

c)      <u>Ryan</u>

It is undisputed that Ryan, like Grace, pulled Renzullo over to serve him with the 209A Order on Anderson's instruction. D. 118 ¶¶ 57, 66; D. 137 ¶¶ 57, 66. Accordingly, for the same reasons explained above, Ryan is not entitled to qualified immunity with respect to Plaintiffs' claim of unreasonable seizure.

With respect to excessive force, Plaintiffs do not appear to contend that Ryan used excessive force during the arrest. <u>See</u> D. 132 at 17–18. However, a reasonable jury could find that Ryan nevertheless failed to intervene to prevent Grace's use of excessive force. "An officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." <u>Miranda-Rivera v. Toledo-Davila</u>, 813 F.3d 64, 73 (1st Cir. 2016) (citation omitted).

Here, Renzullo's testimony is that while he was on the ground, he was "getting hit and stepped on . . . and Officer Grace got on top of him and broke [his] arm and pushed his face into the cement by choking [his] neck with his knee" and that he had to tell Grace "a couple of times" to get his knee off his neck because he could not breathe even though he posed no threat to the Officers nor was resisting arrest. D. 134-9 at 40. While the record is not clear as to exactly how long Grace had his knee on Renzullo's neck, a reasonable jury could find that Ryan had the opportunity to protect Renzullo from Grace's excessive force given that Ryan was at the scene from the start and Renzullo had to ask Grace at least twice that he take his knee off his neck. Accordingly, Ryan is not entitled to qualified immunity as to excessive force.

d)   <u>Morales</u>

Morales is not entitled to qualified immunity with respect to excessive force.  Viewing the facts in the light most favorable to Plaintiffs, Morales arrived at the scene of arrest, observed Grace attempting to secure Renzullo's arms behind his back, placed his taser on Renzullo's shoulder, placed his knee in Renzullo's back and his hand on Renzullo's head even though Renzullo did not pose any threat to the safety of the Officers or others, did not resist arrest and did not attempt to flee.  <u>See</u> D. 124 ¶¶ 134–35, 138–39; D. 135 ¶¶ 134–35, 138–39; D. 134-6 at 17; D. 134-11 at 20.  A reasonable jury crediting Renzullo's testimony could find that Morales used excessive force or that, at minimum, he directly aided Grace in using excessive force.  <u>See</u> <u>Titus</u>, 840 F. Supp. 2d at 414 (stating "anything more than very minimal force, if any, might be found to be inappropriate" where plaintiff did not pose any threat to the safety of the officers or others, did not resist arrest and did not attempt to flee).

e)   <u>Silva</u>

Viewing the record in the light most favorable to Renzullo, Silva arrived at the scene after the initial stop and removed his taser from its holster as he approached the driver's side door.  D. 124 ¶¶ 121, 124; D. 135 ¶¶ 121, 124.  Plaintiffs state that Silva "participated in ripping [Renzullo] to the ground."  D. 133 ¶ 122; D. 134-9 at 37–38.  In his deposition, Renzullo does not specifically say that Silva ripped him to the ground, <u>see generally</u> D. 134-9, but rather that a motorcycle officer, later identified as Silva, was present at the scene, and that "they ripped me to the ground physically . . . [g]rabbed me and threw me to the ground."  <u>Id.</u> at 38.

There is at least sufficient evidence for a reasonable jury to find that Silva failed to intervene to prevent Grace's use of excessive force.  As discussed above, the record in the light most favorable to Renzullo shows that he had to ask Grace at least "a couple of times" to remove

his knee from his neck even though he contends that he was not resisting arrest.  See D. 134-9 at 40; Miranda-Rivera, 813 F.3d at 73.  Since Silva was present while Grace purportedly applied more than minimal force, a reasonable jury could find that Silva had enough time to intervene under the circumstances and failed to do so here.  Accordingly, Silva is not entitled to qualified immunity on Renzullo's use of excessive force claim.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 122, as to Count I as to Plaintiffs' Section 1983 claim for substantive due process, Counts III (Section 1983 claim against Wakefield), Counts IV and V (claims under the MCRA) and Count IX (intentional infliction of emotional distress).  As to just Plaintiffs P.R. and B.R., the Court ALLOWS Defendants motion for summary judgment as to the excessive use of force claim in Count I and the assault and battery charge in Count VII.  The Court otherwise DENIES Defendants' motion, D. 122, and DENIES Plaintiffs' motion for partial summary judgment, D. 116.  Accordingly, this case will proceed to trial on Count I (Plaintiffs' unreasonable stop and seizure claim and Renzullo's excessive force claim), Count II (conspiracy claim), on Count VI (false imprisonment claim), Count VII (assault and battery claim as to Renzullo only) and Count VIII (malicious prosecution claim).

So Ordered.

/s/ Denise J. Casper
United States District Judge